ÆTNA LIFE INS. CO. *v.* AMERICAN SURETY CO.

(*Circuit Court, D. Connecticut.* March 21, 1888.)

1. BONDS—SURETY COMPANIES—MISREPRESENTATIONS—PREVIOUS DEFALCATIONS.

P., the general agent of a life insurance company, having, on his own motion, applied to plaintiff, a surety company, to go on his bond, that company forwarded to the secretary of the insurance company a certificate which, when filled out and signed by him, recited that the agent, "so far as the secretary's knowledge went," had always faithfully performed his duties, and that he was not then "in arrears or default." It also stated that his accounts "were last examined June 13, 1884, and found to be correct in every respect." This certificate bore date June 16, and the bond June 15, 1884. As a matter of fact P. was then in the company's debt $150, on a draft which he had drawn on the company in March, 1884, and which it had paid, but had required an explanation, and demanded repayment. He had had correspondence with the secretary about renewal receipts, the natural inference from which was that the money which they called for had been paid. The company did a very large business, its cash premium income for 1884 being about $2,400,000; and P.'s agency was a comparatively small one. It was also its practice to leave accurate investigation of such agencies until the annual examination, which was had in December. *Held,* that the unpaid draft was not "arrears or default" within the meaning of the certificate, which referred to collection accounts, and that the secretary was not guilty of such laches as would discharge the surety company from liability on the bond for a subsequent defalcation.

2. SAME—EXISTING ACTS OF OMISSION.

The practice of an insurance company required its general agents to remit or account for all moneys during the next succeeding month. Renewal receipts, however, could be held for 60 days after premiums thereon were due, and were often retained by agents longer without objection. P., an agent appointed April 2, 1883, began making defalcations May 15th following, his system being to postpone his monthly accounts as long as he could, and to apply recent payments to old debts. This was kept up until December 4, 1884, when he was discovered, and found to be in arrears $3,041.94, of which amount $2,823.30 had been collected after June 15, 1884. On that day (June 15th) P., on his own motion, procured a bond from a surety company, one provision of which was that the insurance company should notify the surety of any act of omission or commission on the part of P. which "may involve a loss for which the surety is responsible hereunder." P. thereafter continued the same system; sending his June report August 4th, his July report August 24th, and his August report September 29th. He was written to October 1st,

his attention called to the matter, and an explanation demanded. He thereupon returned, about October 8th, a list of outstanding renewal receipts, and in his September report, which was sent October 29th, accounted for all the older collections. His October report came in November 14th, and contained nothing but September collections. The insurance company did a very large business, and P.'s agency was a small one, the accurate investigation of which it was the custom to leave until the annual examination, which took place in December. *Held* that, the company was not guilty of laches in not communicating P's delays to the surety company.

3. SAME—CONCURRENT BONDS.

A general agent of a life insurance company, who had, April 1, 1884, delivered to it a bond for the faithful performance of his duties so long as he should continue in that office, procured and handed over June 15, 1884, another bond of similar purport for one year, which the company accepted with the understanding that liability thereunder was limited to defalcations committed during that time. The old bond, however, was retained. One provision of the new bond was to the effect that if the company should hold, concurrently with it, any other bond, the loss, if any, should be apportioned. *Held,* that as to any loss resulting between June 15, 1884, and June 15, 1885, the two bonds were not concurrent, and that the last bond could be proceeded against for the whole.

4. SAME—DATE WHEN LIABILITY COMMENCES.

The bond of a general agent of an insurance company bore date June 15, 1884, but was not delivered to and accepted by the insurance company until July 29th following. The certificate as to character of the agent, which had previously been submitted to the secretary of the company, contained a blank which was to be filled in by him so as to state when the bond was to be dated, and in this blank he had written "June 15, or June 16, 1884." The bond itself declared that it was made June 15, 1884, and was in consideration of a premium for the term of 12 months ending June 15, 1885. *Held,* that the liability of the surety on the bond accrued, by relation, as of its date.

At Law. Trial by the court.

*Charles J. Cole* and *Charles E. Perkins,* for plaintiff.

*Theodore M. Maltbie* and *Wm. Hamersley,* for defendant.

SHIPMAN, J. This is an action at law, in which, by written stipulation signed by the parties, a trial by jury was waived, and the cause was tried by the court. Upon such trial, the following facts were found to have been proved and to be true: James N. Patrick was, on April 2, 1883, appointed by the plaintiff, a duly incorporated life insurance company, located in and having its principal office in Hartford, Conn., its general agent to procure applications for insurance for it in the state of Missouri, excepting one county; to receive premiums upon all policies issued upon such applications; to collect premiums upon renewals of the same, and to collect renewal premiums on existing policies issued by said company in said territory. He agreed to account to said company on or before the 10th day of each month, or at any other time when required, for all premiums received by him or his agents, and remit the amount of the same, less the charges to which he was entitled by the agreement, and to give a bond to the company for $3,000, with good and satisfactory surety, for the faithful performance of his duties, and to renew and increase the same as might be desired. It was further agreed that the contract could be terminated after one year from its date, by either party, upon not less than 60 days' notice to the other of such proposed termination. By the rules of the plaintiff which existed at the

date of Patrick's appointment, and which continue to exist, all moneys which are received by an agent during each month are to be remitted, less charges, to the plaintiff, with his account, on or before the 10th of the succeeding month. By the practice of the plaintiff, the requirement that the account should be sent as early as the 10th of each month is not insisted upon; but the requirement that all moneys received during the preceding month should be remitted or accounted for in the next month, is imperative. The plaintiff always sends during each month to each general agent renewal receipts for the premiums becoming due during the succeeding month upon policies of insurance to persons within his territory, and such renewal receipts are charged to the respective agents to whom they are sent. This charge is a matter of book-keeping, and does not imply that the agent is indebted to the company for the amount of the receipts which are sent him. By the rules of the plaintiff, if a renewal premium was not paid when due, the policy lapsed, but, if satisfactory evidence was furnished that the person whose life was insured was in good health, and was acceptable, the agent might receive the premium, and deliver the receipt within 60 days from the time when the premium became due, and the insurance would be therefore revived, but the evidence must include a health certificate to be signed by the beneficiary, which should be sent to the plaintiff with the account in which the premiums were reported. Agents were therefore authorized to retain renewal receipts in their hands for 60 days after the premiums mentioned therein were due, and then, if unpaid, were directed to return them to the plaintiff. In practice, agents do sometimes retain such receipts for a longer period without prompt objection or criticism by the company. In each account the amount of each collected premium, the number and date of the policy upon which it was paid, and the name of the person whose life is insured thereby, are given, together with the charges against such premium, so that each account contains an appropriation of the receipts by the agent, and, when accepted, a corresponding acknowledgment of the payments by the plaintiff.

On February 26, 1883, said Patrick gave to the plaintiff a bond, with three persons as sureties in the sum of $3,000, for the payment to the company of all moneys which he should receive belonging to it for one year from April 1, 1883; and on April 1, 1884, gave another bond in said sum of $3,000, with three persons as sureties, for the faithful performance of his duties, so long as he should continue to be its general agent. Prior to June 15, 1884, said Patrick, at his own suggestion, made application to the defendant, an incorporation, duly incorporated for the purpose of executing contracts of indemnity for the conduct of employes, and located and having its principal office in the city of New York, for a bond to the plaintiff in the sum of $3,500. This application was made by Patrick, without the solicitation of the plaintiff, probably because he feared that his bondsmen would become liable, and he preferred that the loss should fall upon a corporation rather than upon his personal friends. The defendant sent the application to the plaintiff, with a printed form of employe's certificate to be filled by an officer of

the company, and to be returned to the defendant. The secretary of the plaintiff thereupon filled the blanks in the certificate, signed the same, and returned the application and the certificate to the defendant. The certificate, when completed, was as follows:

"I have read the foregoing declarations and answers made by J. N. Patrick, and believe them to be true. He has been in the employ of this company during one year, and, to the best of my knowledge, has always performed his duties in a faithful and satisfactory manner. His accounts rendered to this company were last examined on the 13th day of June, 1884, and found to be correct in every respect. He is not, to my knowledge, at present in arrears or default. 1 know of nothing in his habits or antecedents affecting his title to general confidence, nor why the bond he applies for should not be granted to him.

"Amount required $3,500. Bond to date from June 15, or June 16, 1884.
"Dated at Hartford, the 16th of June, 1884.
"J. L. ENGLISH, Secretary, on behalf of Ætna Life Insurance Company."

The bond in suit was thereupon issued, the important portions of which are as follows:

"This bond was made the 15th day of June, 1884, between the American Surety Company, hereinafter called 'the company' of the first part, and J. N. Patrick of St. Louis, Missouri, hereinafter called the 'employe' of the second part, and Ætna Life Insurance Company, hereinafter called the 'employer' of the third part. Whereas, the employe has been appointed in the service of the employer, and has been assigned to the office or position of general agent by the said employer, and has applied to the American Surety Company for the grant by them of this bond: Now, therefore, in consideration of the sum of thirty-five dollars, lawful money of the United States of America, in hand paid to the said company as a premium for the term of twelve months ending on the 15th day of June, 1885, at twelve o'clock noon, it is hereby declared and agreed that, subject to the provisions herein contained, the company shall within three monts next after notice accompanied by satisfactory proof of a loss, as hereinafter mentioned, has been given to the company, make good and reimburse to the employer all and any pecuniary loss sustained by the employer of money, securities, or other personal property in the possession of the employe, or for the possession of which he is responsible, by any act of fraud or dishonesty on the part of said employe, in connection with the duties hereinbefore referred to, or the duties to which, in the employer's service, he may be subsequently appointed, and occurring during the continuance of this bond, and discovered during said continuance or within six months thereafter, or within six months from the death, or dismissal, or retirement of the employe from the service of said employer. * * * That if the employer shall at any time hold, concurrently with this bond, any other bond or guaranty of security from or on behalf of the employe, the employer shall be entitled, in the event of loss by default of the employe, to claim hereunder only such proportion of the loss as the amount covered by this bond bears to such other security; that the company shall be notified in writing, addressed to the president of the company, at its office in the city of New York, of any act of omission or of commission on the part of the employe which may involve a loss for which the company is responsible hereunder, as soon as practicable after the occurrance of such act shall have come to the knowledge of the employer."

The premium was paid by Patrick, June 11, 1884. The bond was sent to him immediately after its date, and was delivered by him, when in Hartford, to the plaintiff, July 29, 1884, which accepted the same;

and thereafter the second bond of said Patrick was not regarded as concurrent for defalcations which might occur after June 15, 1884. In the month of December, 1884, the plaintiff, upon an examination of the books of said Patrick in St. Louis, ascertained that he was indebted to it in the sum of $3,041.94 for premiums of insurance due to it before that time, collected by him and not paid over; that said default was occasioned by acts of fraud and dishonesty on the part of said Patrick, and that the pecuniary loss to the plaintiff resulting from said defalcations amounted to said sum of $3,041.94. Of these facts thus ascertained, and which I find were true, the defendant was promptly notified. No part of said loss has ever been paid to the plaintiff. This amount of $3,041.94 had all been collected since June 15, 1884, except J. F. Schwegman's premium, collected in January, 1884, the net amount due the plaintiff being $80.10, and the following collected in May, 1884.

| | | |
|---|---:|---:|
| Two premiums upon policy of E. Dieckhaus, | $ 95 | 96 |
| "      "      "      "      " Mrs. " | 72 | 78 |
| | 168 | 74 |
| Less commissions and dividends, | 30 | 20 |
| | 138 | 54 |
| Schwegmann's premium, | 80 | 10 |
| | $218 | 64 |

The money collected after June 15, 1884, and not remitted or accounted for, was, on January 1, 1885, $2,823.30.

The defenses are as follows: (1 and 2) A concealment by the plaintiff, at the time of the execution and acceptance of the bond, of previous known defalcations of said Patrick, and misrepresentations by the plaintiff relative to the conduct of said Patrick, which were known to be untrue. These alleged concealments and misrepresentations at the time of the execution of said bond are all contained in said certificate. (3) A concealment in August, September, October, and November, 1884, of Patrick's known acts of omission and commission by which the defendant might be liable to sustain loss. (4) That the second bond of Patrick was concurrent with the bond in suit.

Patrick's first report of premium collections was sent to the plaintiff on May 15, 1883. It accounted for all the collections made in the month preceding, and was accompanied by a bank check for $501.31, the balance due the company; but on May 15th he had collected of the May renewals nearly $400, which had been deposited to his credit in the bank, and, after drawing the check for $501.31, there remained in the bank to his credit $50.52, showing that he had in fact used of the plaintiff's money from $250 to $300. This deficit gradually increased during the year 1883, but was partially made up by the discount of a note for $1,200 in December, 1883, after which the same continually increasing use of the plaintiff's money went on, and resulted in the defalcation which has been stated. The habit and practice of Patrick was to postpone sending

his monthly account for as long a time as he safely could; to send his own check on the St. Louis bank in which he deposited, whereby he gained the time which intervened until the check was returned to St. Louis, and he was able to meet it in part by collections made meanwhile; to omit in his monthly accounts some of the collections which he had recently made, and to enter some of the older receipts which he had omitted in previous reports; so that, from recent collections, he was continually accounting for and paying previous defalcations. It was the habit of the plaintiff, after the examination of each monthly account of any agent, to send to him an "In-hand list" as it is termed, which is a list of the renewal receipts which had previously been sent to the agent, and which had not been returned or accounted for. This list in the case of Patrick, was an increasing list. In the spring of 1884, before the expiration of the first year of Patrick's agency, he commenced writing to Mr. Webster, the vice-president of the plaintiff, about a change in his contract and a new contract. Before March 19, 1884, the two met in Chicago; and the vice-president renewed the guaranty of $1,800 for the next 12 months, which had agreed to be given for the first year. On April 10th the second bond was sent to the plaintiff, and Patrick commenced the second year of his agency on the terms of the previous year. The original contract was never terminated, and he never ceased to be agent under that original employment. He, however, continued his solicitations in regard to a new contract, and on July 29th came to Hartford; had an interview with the vice-president, which resulted in permitting the guaranty of $150 per month to be charged monthly; the payment of clerk hire, of railroad and hotel expenses while on business; the employment for a year of canvassers, and a modification in regard to compensation upon his retirement from the agency. The bond in suit was delivered and accepted, and Patrick asked that the old bond should be surrendered, but the vice-president preferred to wait until previous business had been accounted for. At this time Patrick had not sent his report for June, but said that it was made out, and in his safe, and that he had forgotten to take it when he left St. Louis. Upon his return to St. Louis he sent his June report on August 4th, his July report on August 24th, and his August report on September 29th, which was received by the plaintiff on October 3d. On October 1st the vice-president wrote Patrick, saying that his in-hand list was very large; that over a third of the collections for a full year were due; and asking an explanation of the cause of this large list. Patrick returned, on or about October 8th, policies and renewal receipts amounting in all to $573.16, whereupon, on October 30th, Mr. Webster wrote him that his list looked very much better, but that still a number were due in the early months of the year, which ought to be closed. The September report was sent October 29th, and contained only one September premium; the other items consisted of nearly all the previously unreported collections, to which his attention had been called by Mr. Webster. The October report was forwarded November 14th, and contained the September premiums, and no October premiums. It was dated at the head of the renewal column, October, instead of September,

as a sort of blind. Mr. Nason, the superintendent of agencies, visited St. Louis on December 4th, in the course of a business trip among some of the western agencies, and before the November report was forwarded, and speedily ascertained the fact of the defalcation, which became apparent upon a comparison of the in-hand list with Patrick's cash-book. The foregoing is a general outline of the history of Patrick's agency, and of the bond now in suit; other facts will be stated hereafter.

The question of fact which arises upon the first and second defenses is, did Mr. English know, or had he adequate reason to know, that any one of his statements was untrue? It will be observed that all the statements in the certificate, except one, were declarations of the belief or knowledge of Mr. English; and it will be further observed that Patrick was, on June 15th, and for a long time had been, a defaulter. I see no reason for the opinion that Mr. English, on June 15th, thought that Patrick collected money which he had not accounted for, or that he was not performing his duties in a faithful and satisfactory manner, or that he was in arrears or default as a collecting agent. The only knowledge that he had of Patrick's indebtedness to the company which has presented itself to me as of importance was the non-payment of a draft for $150, which he drew upon the plaintiff in March, 1884, and which it paid; but required an explanation of the reason for making it, and demanded repayment, which had not been made when his May account was rendered,—or on June 15th. He drew the draft because he had a guaranty of $1,800 for the year, and his commissions were apparently not about to yield that sum, and he was poor and needed the money. Mr. English supposed that the form in regard to "arrears or default" referred to the collection accounts of the agent. This was, in fact, its fair meaning, and it was not intended to relate to items of borrowed money, although if these unpaid items had amounted to a sum which was significant, and could reasonably be supposed to indicate that the safety of his collections was in danger, the fact should have been communicated in the certificate.

The remaining branch of the question is, did English have adequate reason to know of Patrick's defalcation and unfaithfulness? For, although he did not know the facts in regard to the agent's conduct, yet, if his ignorance arose from gross negligence in not ascertaining facts which were within his means or knowledge, or if he recklessly made untrue representations, he is chargeable with misrepresentation. Upon this branch of the question, the defendant occupies stronger ground than it does in regard to the knowledge of English. Patrick, on May 27, 1884, advised English that two annual premiums of Dieckhaus and wife had been paid in advance. These premiums were not accounted for in the monthly reports. On June 15th, Patrick had renewal receipts in his hands which were four or five months past due, of which $621.15 were due in January, and $336.21 were due in March. On May 27, 1884, by letter to English, Patrick asked for the renewal receipts of one Taylor, from which English justly inferred that the December, 1883, renewal had been paid, and wrote him June 9th that he hoped it would

be reported in his next report.    I think that English thought that the omission to account for this premium was due to carelessness or negligence, and not to embezzlement.    Subsequently, and after June 15th, Patrick replied that the omission was the fault of his clerk.    The poverty of Patrick was shown by his permitting his own policy to lapse in December, 1883, and by his letters to the vice-president of December 29, and December 31, 1883, and January 4, 1884.    The fact in regard to the apparent laches seems to me to be this:   The plaintiff evidently does a large business.    It was stated in the argument of the defendant's counsel that the returns made by it to the Connecticut Insurance Commissioner for 1884, showed that its cash premium income for that year was $2,381,617.17.    It did not look after a small agency with the promptness and sharpness which it would have done had its business been smaller, and had its needs of prompt payment been larger; letters written during the month in regard to individual payments were not probably compared with the current monthly account; the business of accurate investigation was left to the final report for the year, in December, which was required to be an exhaustive one, or to the examination of the superintendent for agencies during his tours among the agents.    It is plain that the secretary cannot be expected to carry in his memory the details of the letters which he receives from agents, or to make himself the comparison of letters with monthly accounts.    If that is done, it must be done by subordinates, or by a larger force of the book-keepers, whose business it is to examine agents' accounts.    While therefore, in my opinion, a more thorough system of investigation, and a more constant watchfulness of Patrick's accounts, probably would have disclosed to some one in the home office, prior to June 15th, that Patrick's accounts were behindhand, and that, unless dishonest, he was very remiss, I cannot find that English ought to have known these facts, or that he was guilty of laches in not knowing them.    A requirement which should compel an employer, who is merely stating his opinion, to use, for the benefit of a proposed surety, great vigilance in regard to the accounts of an employe, and greater vigilance than the successful employer uses himself in his own large business, and which has heretofore apparently proved to be adequate, is one which neither law nor good reason demands.

  The next question of fact relates to the non-disclosure to the defendant of Patrick's remissness in August, September, October, and November, 1884.    The obligation of the defendant was to pay to the plaintiff any pecuniary loss which it had sustained during the specified time by any act of fraud or dishonesty on the part of Patrick, in connection with his duties as agent.    The plaintiff was obliged to promptly notify the defendant of any act of omission or of commission on the part of Patrick which "may involve a loss for which the company is responsible hereunder." It cannot be supposed that this provision calls upon the employer to notify the defendant of every act of laches or delay or inefficiency on the part of the agent, which ultimately may create a loss to the employer. It means that the defendant shall be notified of acts which may create a loss for which it is responsible,—that is, a loss arising from fraud or dis-

honesty. It is not necessary to undertake to define affirmatively what kind or class of acts must be communicated, and whether or not the obligation compels the employer to notify the defendant of that kind of conduct of the employe, outside of his business, which experience has shown may probably result in dishonesty. It is sufficient to say that mere laches or inefficiency of the employe in the business, which is consistent with integrity, was not required to be communicated. This defense involves the question whether the plaintiff knew, or had adequate reason to know, from August to November, that Patrick was a defaulter. It is obvious from the conduct of the officers that they did not know the facts in regard to Patrick. Their acts and their correspondence show this. Patrick was unavailingly requesting the vice-president to come to St. Louis, without disclosing a reason for the request. Webster neither went nor sent the superintendent, and showed that he did not think there was any necessity for a visit. I am by no means certain that the plaintiff is to be charged with the duty of communicating, during the life of the bond, facts which it did not know, but which by the exercise of due diligence it could have known. Assuming that such an obligation rested upon the employer, the question whether its officers ought to have known of Patrick's defalcation, depends in a great degree upon the same considerations which have heretofore been stated in regard to their knowledge on June 15th. Greater vigilance, or a larger clerical force, would have caused the criticisms which Webster made on October 1st, to have been made earlier, and would have earlier sent an examiner to St. Louis; but a demand of that grade of vigilance on the part of employers would speedily result in a cessation of business on the part of the defendant. The conduct of Patrick in not remitting was equally consistent with great remissness in collecting, or with a lack of integrity. The vice-president evidently did not adopt the theory of want of integrity. I do not find that the plaintiff had knowledge of such circumstances as to compel a knowledge of Patrick's default prior to December 4th, when the superintendent visited St. Louis.

The fourth defense is that the bonds given on and after April 1, 1884, were concurrent. The bond from the defendant was procured by Patrick in order to substitute it for the existing bond as to new transactions. It was accepted by the plaintiff, with the understanding that the old bond was not to exist against losses from unfaithfulness which occurred after June 15th. The two bonds were not concurrent.

The remaining questions are those of law. It is insisted by the defendant that there is no liability for any defalcation prior to July 29th, the date of the delivery of the bond to the plaintiff. It is true that "the delivery of a deed is presumed to have been made on the day of its date. But this presumption may be removed by evidence that it was delivered on some subsequent day; and, when a delivery on some subsequent day is shown, the deed speaks on that subsequent day, and not on the day of its date." *U. S.* v. *Le Baron,* 19 How. 73. In this case the delivery of the bond to Patrick, which was soon after its date, was not a delivery to the plaintiff. The latter had a right to accept or reject it, when

it for the first time was seen and examined. It was not delivered or accepted until July 29th, but when accepted it took effect in accordance with its express terms, and if, by its terms, it commenced on June 15th, and was to continue for 12 months thereafter, the bond, if delivered and if accepted during the 12 months, related back to June 15th. *Dawes* v. *Edes*, 13 Mass. 177; *Hatch* v. *Attleborough*, 97 Mass. 533. The employer was required to fill a blank in his certificate, stating when the bond was to be dated. This has some significance when taken in connection with the terms of the bond, which declares that it was made on the 15th of June, 1884, and was in consideration of $35 paid as a premium for the term of 12 months ending on June 15, 1885, at 12 o'clock noon. It also provides that the bond may be canceled upon one month's notice, and refunding the premium paid, less a *pro rata* part thereof for the term it has been in force, remaining liable for any default which may have been committed by the employe up to the date of such determination. These various provisions show clearly that the obligation was to commence on the prescribed day, and was to continue for one year, subject to cancellation, and that the day of delivery and acceptance was not the day from which the defendant's liability was to date.

The only remaining question is as to the amount of the defendant's liability. He received, after June 15th, $2,823.30, which he either used himself, or wrongfully accounted for. That sum of money which he received after the date of the bond, instead of being honestly applied, was by fraud and dishonesty applied in payment of previous defalcations, and the new collections were, by like fraud, not accounted for. The amount due upon the defendant's obligation was on January 1, 1885, $2,823.30, for which, with interest to the date of the payment, let judgment be entered in favor of the plaintiff.