**BOSTON MUTUAL LIFE INSURANCE COMPANY, Plaintiff,**

v.

**FIREMAN'S FUND INSURANCE COMPANY, Defendant.**

Civ. A. No. 82–1786–K.

United States District Court, D. Massachusetts.

July 22, 1985.

Alan Spiro, Will J. Bangs, Wm. Gerald McElroy, Jr., Choate, Hall & Stewart, Boston, Mass., for plaintiff.

Allen N. David, Paul R. Devin, Peabody & Arnold, Boston, Mass., for defendant.

Opinion

KEETON, District Judge.

Plaintiff, Boston Mutual Life Insurance Company ("Boston Mutual"), filed suit against Fireman's Fund Insurance Company ("Fireman's Fund") to recover on a Fidelity Name Schedule Bond for losses resulting from dishonest acts of Alexander M. Thompson, doing business as Alex Thompson Insurance Service ("Thompson"). This action is before the court under diversity jurisdiction. *See* 28 U.S.C. § 1332 (1982). The evidence was presented in a five day non-jury trial. On the basis of the findings and conclusions recited in this Opinion, judgment will be entered for the defendant because of plaintiff's failure to give notice as required by paragraph 6 of the bond.

## I.

Boston Mutual is an insurer on various life, accident, and sickness group insurance policies for public employees in the State of Maryland. These group insurance policies are managed by a third-party administrator, who acts as a contact between the primary insurer, Boston Mutual, and the insured employees, their union, and the payroll centers that remit premiums. In

October 1976 Boston Mutual entered into an agreement with Thompson providing that he was to serve as the third-party administrator for the Maryland group insurance policies. During 1977 and 1978, Boston Mutual discovered that Thompson had misappropriated some of its premiums from the group insurance policies. Thompson agreed to return the money, and he signed a $120,000 note payable to Boston Mutual and eventually gave Boston Mutual a mortgage on his home. In light of Thompson's agreement to return the money, Boston Mutual decided not to terminate his service as third-party administrator.

On November 10, 1978, Boston Mutual purchased a Fidelity Name Schedule Bond from Fireman's Fund. The bond covered Boston Mutual against losses resulting from larceny, embezzlement, and misappropriation or any other fraudulent or dishonest acts committed by its employees, including third-party administrators. Between 1978 and 1981, Thompson allegedly misappropriated almost $500,000 in premiums from Boston Mutual. Boston Mutual notified Fireman's Fund of these acts on March 30, 1981, and seeks to recover all of the misappropriated funds. Fireman's Fund contends that, under the terms of the policy, Boston Mutual is not entitled to recover the alleged losses.

## II.

The relevant provisions of the bond follow:

### THIS BOND IS SUBJECT TO THE FOLLOWING CONDITIONS:

.  .  .  .  .

### WHAT EMPLOYEES ARE COVERED— WHEN COVERAGE EFFECTIVE

2. This bond shall be effective as of the 10th day of November, 1978. Employees named in the attached schedule are covered on and after the effective date. . . .

.  .  .  .  .

### TERMINATION OF COVERAGE

5. The coverage on any employee shall terminate when the employment terminates; . . . or the Insured becomes aware of any act of the employee which is or could be made the basis of a claim under this bond. . . .

.  .  .  .  .

### TIME LIMIT FOR DISCOVERING AND REPORTING LOSS AND BRINGING SUIT

6. Compliance by the Insured with the following limitations shall be a condition precedent to recovery hereunder: That as soon as reasonably possible and in any event within fifteen days after discovery by the Insured of any act or circumstance indicating a probable claim hereunder, written notice thereof be given to the Underwriter ...; that within ninety days after such discovery, itemized sworn statement of claim be filed with the Underwriter. . . .

Exhibit 111, at 1–3.

The principal legal issues in dispute in this case center on differing interpretations advanced by the parties as to the meaning and effect of a phrase in paragraph 5, "Termination of Coverage,"

the Insured becomes aware of any act of the employee which is or could be made the basis of a claim under this bond[,]

and a phrase in paragraph 6, "Time Limit for Discovery and Reporting Loss and Bringing Suit,"

discovery by the Insured of any act or circumstance indicating a probable claim hereunder.

The decision in this case turns upon the application of the notice requirement prescribed in paragraph 6. Because of the relevance of both similarities and differences between paragraph 6 and paragraph 5, this Opinion examines both provisions.

Defendant contends that, in determining whether Boston Mutual became "aware" of enough to terminate coverage before all the losses claimed had occurred (paragraph 5), or made "discovery" of enough to bar recovery for noncompliance with the re-

quirement of written notice (paragraph 6), the court should apply a standard that is, to some extent, objective rather than purely a state-of-mind standard. Thus, a central issue before the court may be stated in this way: Under applicable law, will "aware" as used in paragraph 5 and "discovery" as used in paragraph 6 be held to refer only to states of mind, or may the plaintiff be held to be "aware" and to have made a "discovery" because, by some objective standard of judgment, plaintiff should have been "aware" and "should have discovered" some relevant fact or circumstance?

The defense argument for an objective standard is not merely an argument that negligence in failing to discover loss earlier terminated coverage and invoked the notice requirement. That is, the choice among standards is not simply a choice between one objective standard—the negligence standard—and one subjective standard—the state of mind of knowledge of Thompson's fraud. In this, as in other contexts, many objective standards might be suggested, ranging from slight negligence to a form of extreme fault that is sometimes described as ignoring the obvious—failing even to recognize what would be perceived by all but the most foolish persons. Similarly, many different state-of-mind standards might be suggested—ranging from knowledge that Thompson had committed fraudulent acts that had caused probable loss within the coverage of the bond to "awareness" or "discovery" of some defined act or circumstance, without "awareness" or "discovery" of its significance. How should the court determine which among these many possibilities is the standard to be applied under the law applicable to this case?

The answer cannot be found by comparing the number of decisions applying subjective standards with the number applying objective standards for defining the duration of coverage or determining when written notice must be given. Neither party has called attention to any applicable precedent explicitly purporting to override the manifested intent of the parties in relation to the contractual provisions at issue here. Thus, no basis for rights at variance with contract provisions having been shown to apply, the contract between the parties is to be construed and enforced in accordance with the manifested intent of the parties. As to each of the two clauses at issue here, "it is a contract provision we are interpreting, and meaning is to be extracted in the usual commonsense ways." *Morin v. Massachusetts Blue Cross, Inc.*, 365 Mass. 379, 387, 311 N.E.2d 914, 919 (1974).

Parts III and IV of this Opinion examine the two clauses at issue from the perspective of a commonsense interpretation. Parts V and VI of the Opinion consider contentions for a different interpretation and authorities cited in support of and in opposition to those contentions. Parts VII, VIII, and IX apply the conclusions of law to the facts of this case.

### III.

The "Termination of Coverage" clause of the bond states that the duration of the period of coverage shall extend from November 10, 1978 until plaintiff "becomes aware of any act of the employee [Thompson] which is or could be made the basis of a claim under this bond." A commonsense construction of the phrase "becomes aware" is that it refers to a state of mind. This interpretation is consistent with ordinary usage.

Applying a state-of-mind standard to any claim of vicarious liability—that is, liability of one person or entity for the conduct of another—may present a number of special problems. One troublesome problem—whether one responsible person must be found to have both the requisite state of mind as to the existence of the bond and as to the fraudulent acts of Thompson—is considered in Part VIII. A related but less troublesome point, not in dispute in this case, is that the standard of being "aware" applicable to Boston Mutual in this case is satisfied if it is proved that a person in authority for Boston Mutual (that is, a person having authority and acting within the

scope of that authority), was "aware." *Cf. Guthrie v. J.J. Newberry Co.*, 297 Mass. 245, 249, 8 N.E.2d 774, 776 (1937) (using the idiom of "imputing" to defendant corporation its restaurant manager's knowledge of plaintiff's contention that she had been made ill by eating food purchased in its restaurant). Thus, one relevant inquiry is whether some person in authority for Boston Mutual, at a time preceding occurrence of part or all of the loss claimed, became "aware."

As with any other state-of-mind standard, we must answer the question, "aware of what," before we have defined the standard for determining the issue at hand. The answer provided by clause 5 of the bond is, "of any act of the employee [Thompson] which is or could be made the basis of a claim under this bond." Does this clause mean that awareness need extend only to the act itself, so the standard is satisfied without a finding of awareness that the act has significance, or even potential significance, in relation to a claim under the bond? Or must the awareness extend as well to the fact that the act "is ... the basis of a claim," or at least to a possibility that the act "could be made the basis of a claim"?

■ I conclude that a fair and reasonable construction of this language requires awareness by a person in authority for plaintiff not only of an "act" of Thompson, such as remittance to plaintiff of a premium payment at a time months after it was due, but also awareness by a person in authority for plaintiff that this act "is ... the basis of a claim" of fraud by Thompson or awareness of the possibility that it "could be made the basis of a claim" of fraud. For example, suspicion that Thompson was delaying remittance to Boston Mutual after receiving the premium payment and was using the funds in the meantime for purposes not authorized by Boston Mutual would satisfy the awareness standard. The phrase "could be" sets a standard concerned with likelihood rather than certainty of claim, but construed in accordance with ordinary usage, it does not convert "aware-

ness" from a state-of-mind standard to an objective standard. Thus, a commonsense interpretation of the contract is that coverage does not terminate merely because some other person, more suspicious and discerning than any of the persons in authority for plaintiff, could or even would have thought a basis existed for a claim that Thompson was acting fraudulently. Subject to one more qualification noted in the paragraph next below, however, coverage does terminate when some person in authority for plaintiff forms this state of mind of being "aware" of an act of Thompson and being "aware" that this act of Thompson "is ... the basis of a claim" or of the possibility that it "could be made the basis of a claim" that Thompson was acting fraudulently. I reach this conclusion on the ground of fair and reasonable interpretation of the language, in the context of its use in this bond. For this reason, I need not consider whether this result would be required in any event by application of the rule of resolving ambiguities against the insurer—a rule that is, of course, an established part of Massachusetts law. *See, e.g., Morin v. Massachusetts Blue Cross, Inc.*, 365 Mass. at 389–90, 311 N.E.2d at 920.

A question might be raised about the meaning, in another respect, of the phrase "claim under the bond" as used in the Termination of Coverage clause. If a person in authority for Boston Mutual knows at some time about the bond and its applicability to loss caused by fraudulent acts of employees, does coverage terminate when at a later time that person in authority learns about an act of an employee and recognizes that it is or might be a fraudulent act? Or does the phrase "aware of any act ... which is or could be made the basis of a claim under the bond" mean that termination by reason of this person's awareness occurs only if and when this person forms the state of mind of recognizing (that is, adverting to) the relationship among the act, its fraudulent or at least potentially fraudulent nature, and the coverage under the bond? To put the same question another way, must such a person

be thinking about the bond and a possible claim under it in order to be "aware" of an act and "aware" as well that it "is or could be made the basis of a claim under the bond?" Even one who agrees without reservation that the interpretations stated in the above paragraphs comply with a commonsense reading of the Termination of Coverage clause may nevertheless be troubled about this issue. I conclude, however, that I need not answer this question in the present case because of factfindings recited in Part VIII of this Opinion.

In summary, subject to the additional qualification considered in Part VIII of this Opinion, I have thus far concluded that under a commonsense interpretation of the Termination of Coverage clause, coverage with respect to Thompson's act terminates when some person in authority for plaintiff forms the state of mind of (a) being aware of an act of Thompson, and also (b) being aware that this act is a fraudulent act or being aware that this act possibly could be of such a nature that it could be made the basis of a claim of fraud.

### IV.

Paragraph 6 of the bond, prescribing a requirement of written notice, likewise defines a state-of-mind standard. The requirement of written notice is triggered by "discovery by the Insured." Here, too, we must answer the question, "discovery of what," before we have defined the standard for determining when written notice must be given. Under paragraph 6, what must be discovered is "any act or circumstance indicating a probable claim hereunder." Giving a commonsense interpretation to the words "indicating a probable claim," as used in this context, I conclude that what is required is realization that the act or circumstance is such that at the moment it appears more probable than not that when more is known Boston Mutual will have a basis for making a claim of fraud by Thompson. I do not construe this phrase as requiring a finding that it is more probable than not that the claim will succeed, or even a finding that it is more probable than not that Boston Mutual will make the claim. Particularly in the context of a contention, though disputed, that Boston Mutual may have had economic incentives to forego claims both against Thompson and against Fireman's Fund because of a perception that asserting these claims would also result in the loss of lucrative group insurance contracts controlled by Thompson, it would stretch beyond commonsense interpretation to hold that the probability referred to is probability that Boston Mutual will choose to make the claim rather than probability that it will have a good faith basis for doing so.

■■ The conclusions reached in Part III of this Opinion apply here as well and for the same reasons. Also, the reservation stated there about the meaning of "claim under the bond," in paragraph 5 applies also to the phrase "claim hereunder" in paragraph 6. Here, as there, because of the factfindings I make in Part VIII of this Opinion, I need not address the issue as to whether the state of mind must include awareness of the bond and its coverage as well as the possible claim of fraud. Thus, subject to the additional qualification considered in Part VIII, I conclude that the notice provision may be invoked by the defendant upon proof that, more than fifteen days before written notice was given, some person in authority for the plaintiff formed the state of mind of "discovery" of an act of Thompson (or of a "circumstance" relating to Thompson's performance) and "discovery" that the act (or circumstance) was one "indicating a probable claim" of fraud by Thompson, as the quoted phrases are construed in the preceding paragraph.

### V.

Arguing against the foregoing conclusions, defendant asserts that even though standards of "awareness" and "discovery" concern states of mind and are thus at least partly subjective, nevertheless they are also partly objective and are satisfied if facts known and inferences that would be drawn from those facts by an ordinarily prudent person in Boston Mutual's circum-

stances would have alerted that person to a possible basis for a claim under the bond. It is true that defendant is able to point to passages in some opinions that may be read as supporting this contention. Closer examination of those cases persuades me, however, that they are not squarely on point and that, if interpreted as defendant contends, they stand against the weight of authority both in contract law generally and in fidelity insurance law particularly.

Since the parties agree that Massachusetts law applies to the present case, I turn first to the Massachusetts case that is most nearly in point, *Gilmour v. Standard Surety & Casualty Co.*, 292 Mass. 205, 197 N.E. 673 (1935). In that case, the Supreme Judicial Court, though affirming trial court findings and a judgment for the insured, included in its opinion passages that may reasonably be interpreted as saying an insured is "charged" with knowledge of whatever an ordinarily prudent person would have realized in the circumstances. The surety bond on which an action was brought included a provision stating that the obligation of the surety was subject to the following condition:

> That loss be discovered during the continuance of this suretyship or within six (6) months after its termination, and notice delivered to the Surety at its Home Office within ten (10) days after such discovery.

*Id.* at 206, 197 N.E. at 673. The central issue addressed by the court on appeal was "whether the evidence warranted a finding that the plaintiffs complied with the requirement of the bond that notice should be delivered to the surety within ten days after the plaintiffs' 'discovery' of 'loss.'" *Id.* at 206, 197 N.E. at 674. The court stated:

> The contract of suretyship made by the defendant provided indemnity to the plaintiffs in the event that they sustained loss through dishonest conduct on the part of the agency. Loss in fact came to the plaintiffs because the agency wrongly appropriated to the payment of its own debts moneys received by it as premiums on the policies issued by the plaintiffs. None of the individual plaintiffs personally dealt with the agency. The employees of the plaintiffs who on their behalf had dealings with the agency denied having knowledge of the agency's wrongful conduct until after May 9. There was no direct evidence that the employees earlier had actual knowledge of fraudulent, dishonest or criminal acts. *It is the contention of the defendant that it must be inferred* from the terms of the contract with the agency and from circumstances of which responsible employees were aware prior to May 10, *that they knew or reasonably should have known that the agency had acted fraudulently, dishonestly or criminally* with respect to premiums which it had collected and had not remitted to the plaintiffs.

. . . . .

> We are not here immediately concerned with the question of the circumstances under which at common law an obligation is imposed on the obligee in a fidelity bond to give to the surety notice of a default by the principal. (*Watertown Fire Ins. Co. v. Simmons*, 131 Mass. 85.) As stated in the defendant's brief, the sole issue here presented is whether the trial judge was warranted in finding that the plaintiffs sufficiently complied with the provision of the bond requiring that notice of loss be given by the plaintiffs to the surety within ten days after the discovery of loss. The giving of such notice was made a condition precedent to recovery on the bond. *Friedman v. Orient Ins. Co.*, 278 Mass. 596, 598–99 [180 N.E. 617].

> The character of the loss for which the plaintiffs were to be indemnified was defined in the bond as "any pecuniary loss ... occasioned by any act or acts of fraud, dishonesty or any criminal act" of the principal. The instrument was manifestly not intended to furnish a guaranty of the credit of the principal or indemnity for its merely negligent conduct not amounting to some form of dishonesty. Thus mere want of punctuality on the

part of the agency in furnishing a list of policies the premiums on which it had received, in making remittances or in performing similar contract requirements, or delays acquiesced in by the plaintiffs unassociated with dishonesty of the agency or lack of good faith on the part of the plaintiffs would not require giving the notice stipulated in the bond. *Pacific Fire Ins. Co. v. Pacific Surety Co.* 93 Cal. 7 [28 P. 842]. *Aetna Life Ins. Co. v. American Surety Co.* 34 Fed.Rep. 291 [ (1888) ]. The indemnity provided was for the results of the agency's fraud, dishonesty or crime and not its negligence.

. . . . .

*The contingency which made a notice necessary was not the occurrence of a loss but rather the plaintiffs' discovery of a loss which had occurred.* The provision as to notice is in the interests of the surety and *the language cannot reasonably be construed to mean that the giving of notice could be deferred until such time as the plaintiffs had not only discovered but were actually able to prove that loss had occurred.* That would be of no benefit to the surety. Another provision in the bond required a formal sworn claim of loss to be furnished at a later time. It is manifest that in the requirement of notice something less than discovery of demonstrable loss is meant.

*But discovery of loss must mean knowledge of loss,* that is, knowledge derived from known facts or reasonable inferences of fact. If facts known to an obligee in a bond containing such a provision *and inferences which should reasonably be drawn therefrom would inform the ordinary man in his situation that there had been a loss, he has discovered the loss* within the meaning of the language of the bond. If such facts and inferences do no more than create in his mind a mere suspicion of loss the necessity of notice does not arise. *American Surety Co. v. Pauly (No. 1),* 170 U.S. 133, 145, 147 [18 S.Ct. 552, 557,

558, 42 L.Ed. 977]. *American Surety Co. v. Pauly (No. 2),* 170 U.S. 160, 164 [18 S.Ct. 563, 564, 42 L.Ed. 987]. *Bank of Tarboro v. Fidelity & Deposit Co.* 128 N.C. 366, 374 [38 S.E. 908]. *National Surety Co. v. Western Pacific Railway,* 200 Fed.Rep. 675, 682 [ (9th Cir.1912) ]. *United States Fidelity & Guaranty Co. v. Barber,* 70 Fed.Rep. (2d) 220, 224 [ (6th Cir.1934) ]. See also *Fidelity & Casualty Co. v. Gate City National Bank,* 97 Ga. 634, 637 [25 S.E. 392]; *Fidelity & Deposit Co. of Maryland v. Bates,* 76 Fed.Rep. (2d) 160, 167 [ (8th Cir.1935) ].

*The question here to be decided is whether the evidence and reasonable inferences therefrom warranted the judge's finding that the plaintiffs did not, before May 10, have knowledge that a loss had been occasioned by the fraud, dishonesty or crime of the agency.* Prior to April 20, at which time the plaintiffs demanded a list of the collected premiums and a remittance, the agency had made remittances only after telephone calls by the plaintiffs. After that date there was further delay in the sending of the requested list and when such list was finally sent no remittance went with it. *A finding was warranted that the agency was neglectful in performing its obligations under their oral agreement. But negligence does not necessarily spell fraud, dishonesty or crime.* There was no testimony that the plaintiffs had information of any specific act of the agency of that character and *it was knowledge of wrongful conduct of that sort which, under the bond, required notice to the defendant.* Knowledge of a fact may, of course, be acquired by inferences from other known facts. In determining *whether the conduct of the agency which was known to the plaintiffs should have been given by them the sinister significance* which required notice to the defendant, the trial judge had the right to take into account the circumstances in which that conduct appeared. *There was evidence of circumstances which, if believed, tended to show that the known conduct of the*

*agency was not such as reasonably to charge the plaintiffs with knowledge of that kind of conduct which obligated the plaintiffs to give notice to the defendant.* During the first few months in a year most of the policies under the compulsory motor vehicle insurance law are issued and during the period with which we are here concerned the office forces of the agency and of the plaintiffs were abnormally busy and overworked. Both transacted in that time a large amount of business. The plaintiffs knew that the agency extended credit to many of its customers but did not know or seek to know the terms of such credits. The agreement did not require a remittance on account of premiums until they were collected from the customers, a monthly statement of policies which had been issued was furnished by the plaintiffs and a list of policies on which premiums had been paid was prepared by the agency. There was no evidence of rumors that the agency was insolvent or that its officers or employees were dishonest. *The experience which the plaintiffs had in their dealings with O'Keefe prior to the latter part of April was not such as to make it unreasonable for them to give some credit to the representations he then made to them.* The responsible head of the agency was at the time particularly busy in civic or political affairs and not easily accessible on matters concerning the business of the agency. The plaintiffs consulted counsel on May 8, but on the evidence of the participants that consultation was not the result of the acquisition of knowledge of dishonest conduct of the agency but came from the desire to press for an overdue remittance from a dilatory debtor. *We think that the question whether before May 10 the plaintiffs had acquired knowledge of facts which with reasonable inferences therefrom denoted the misconduct of the agency as to which the bond provided indemnity and required notice, was on all the evidence a question of fact for the determination of the trial judge.*

*Id.* at 207, 210–13, 197 N.E. at 674–76 (emphasis added).

A preliminary point is that the clause before the court in *Gilmour* was less restrictive (more favorable to the plaintiff) in one respect than either of the clauses in the present case. It answered the question, "discovery of what," with the word "loss," which the court construed to mean "loss accomplished." In contrast, the phrases used in the present case were "is or could be made the basis of a claim" and "indicating a probable claim." That distinction, however, does not appear to have influenced the court's reasoning on the more central issue as to whether the standard for determining "discovery" is to any extent objective—that is, a standard phrased in terms of reasonable prudence, negligence, or even gross negligence.

Several of the emphasized passages quoted from the *Gilmour* opinion say that if an inference of loss should reasonably be drawn from facts known to a person, that person has "discovered" the loss. This is, of course, an objective standard—essentially like the standard used in the law of negligence. Also, the phrase "charge the plaintiffs with knowledge," used at one point in the opinion, implies a departure from a state-of-mind standard of "knowledge" and resort, instead, to holding plaintiffs accountable as if having knowledge, whether having it or not.

But another passage states that "negligence" (referring to negligence of the alleged wrongdoer rather than negligence of the plaintiffs), "does not necessarily spell fraud, dishonesty, or crime." The reason this is plainly so is that proof of "fraud," "dishonesty," or "crime" requires proof of a state of mind rather than merely proof of violation of the objective standard of reasonable care. It seems most likely that a court so holding would also hold—were the issue squarely before it for decision—that negligence of the plaintiffs (suing on a fidelity bond) in not knowing does not necessarily spell knowledge. That an ordinarily prudent person would have known, in like circumstances, is circumstantial evi-

dence of knowledge but not the equivalent of knowledge. Moreover, other passages, as well as the court's statement of the "question here to be decided," focus on the judge's finding (and upon the sufficiency of the evidence to support a finding) that "plaintiffs did not, before May 10, have knowledge that a loss had been occasioned by the fraud, dishonesty or crime of the agency." Thus, the holding, as distinguished from obiter dicta, was an affirmance of the trial judge's factfinding that plaintiffs had not discovered the loss before the critical date of May 10.

I do not suggest that a federal judge, in attempting to determine applicable state law, should disregard considered dicta of the highest court of the state. Indeed, I would take precisely the opposite view if such dicta were the only indicia of how the case now before me would be resolved by the Supreme Judicial Court of Massachusetts if this case were before that court, on certification or otherwise. In this instance, however, the obiter dicta supporting defendant's contention for an objective standard rather than a true state-of-mind standard are themselves contradicted by the implicit meaning noted above, if not the explicit declarations, of other passages in the same opinion—other obiter dicta.

Taking account of all these contradictory implications of different passages from the *Gilmour* opinion, I conclude that the opinion is not authority for the proposition that Massachusetts law holds that an insured is "charged" with being "aware" or with having "discovered" things that a reasonable person in the insured's position would have discovered. Rather, seeking to understand Massachusetts law as well as may be done in these circumstances, I conclude that the more prominent of the apparently contradictory implications of *Gilmour*—and the one more appropriately described as its holding—treats the issue of "discovery" as a fact issue regarding state of mind, and not an issue to be determined by a standard of reasonable prudence or a standard "charging" an insured with a "discovery" the insured had not made. Also, I conclude, for reasons stated immediately below, that this interpretation is more compatible with Massachusetts law applicable generally to contracts and especially to insurance contracts.

This interpretation of *Gilmour* is supported by recognition of the distinction that is well established in Massachusetts law, as in the American legal system generally, between rules of law defining any state-of-mind standard and rules of law regarding methods of proof.

A state of mind, like any other fact, may be proved by circumstantial evidence. Indeed, in litigated cases direct evidence of a disputed state of mind is seldom available. But trial judges regularly tell juries that what a person says and does, or fails to say or do, may be considered, along with other relevant evidence, as evidence of that person's state of mind. Advocates are permitted to argue to the jury (or to the trial judge as factfinder, as defense counsel has done here) that the evidence shows the person to be so well informed about the circumstances and so experienced and intelligent that the jury should find that the person knew and understood at least as much as the ordinarily prudent person in the same circumstances would have known and understood. The argument wins, however, only if it persuades the factfinder to find that the person did in fact have the material state of mind. It is not enough to show that the person should have had that state of mind, or that an ordinarily prudent person would have had that state of mind. Indeed, as plaintiff's counsel has forcefully argued here, when a person whose state of mind is at issue testifies under oath that he did not have that state of mind, the factfinder must discredit that testimony in order to find that the state-of-mind standard has been satisfied.

Observing this distinction carefully is fundamental to applying any state-of-mind standard correctly. In certain contexts, observing it is a constitutional imperative. *E.g., Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979) (conviction, under charge that one is presumed to

intend the natural and probable consequences of his acts, set aside); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) (proof of knowledge of falsity or state of mind of conscious disregard for truth or falsity required to overcome constitutional privilege in defamation case); *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968) (same); *National Association of Government Employees, Inc. v. Central Broadcasting Corp.*, 379 Mass. 220, 230–33, 396 N.E.2d 996, 1002–04 (1979) (applying federal Law), *cert. denied*, 446 U.S. 935, 100 S.Ct. 2152, 64 L.Ed.2d 788 (1980). I do not suggest that this distinction has constitutional significance in the present context. But to fail to observe this distinction carefully in applying a contractually defined standard concerning the state of mind of an insured would be contrary to fundamental principles of insurance law in that it would grant the insurer a right sharply at variance with the provisions it has chosen to place in its own standard forms.

Authorities outside the law of Massachusetts reflect essentially the same conflicting expressions that close analysis has revealed within the *Gilmour* opinion. *Gilmour*, 292 Mass. at 212, 197 N.E. at 676, cites with approval the Supreme Court opinions in *American Surety Co. v. Pauly*, 170 U.S. 133, 18 S.Ct. 552, 42 L.Ed. 977 (1898) (*Pauly I*) and *American Surety Co. v. Pauly*, 170 U.S. 160, 18 S.Ct. 563, 42 L.Ed. 987 (1898) (*Pauly II*). These opinions are often cited as authority that when "discovery" of loss triggers a requirement of notice, the insurer cannot successfully invoke the notice requirement by proving only that the insured should have discovered the loss or that an ordinarily prudent person in the insured's position would have discovered it. *See, e.g., Perkins v. Clinton State Bank*, 593 F.2d 327, 333–34 (8th Cir. 1979); *Federal Deposit Insurance Corp. v. Lott*, 460 F.2d 82, 86–87 (5th Cir.1972); 35 Am.Jur.2d *Fidelity Bonds and Insurance Law* § 59 (1967 & Supp.1984) (generally held that insured not required to give no-

tice "until he has actual knowledge of the loss or dishonest act").

The contrasting point of view reflected in *dicta* from *Gilmour*, 292 Mass. at 211, 197 N.E.2d at 676 ("If facts known to an obligee in a bond ... and inferences which should reasonably be drawn therefrom would inform the ordinary man in his situation that there had been a loss, he has discovered the loss within the meaning of the bond."), relied upon by defendant in this case, appears also in judicial opinions of other courts. *See, e.g., Utica Mutual Insurance Co. v. Fireman's Fund Insurance Co.*, 748 F.2d 118, 121–22 (2d Cir. 1984) (explicitly applying an "objective test"); *Columbia Union National Bank v. Hartford Accident & Indemnity Co.*, 669 F.2d 1210, 1213–14 (8th Cir.1982) (apparently applying an objective test).

Thus, examination of the whole array of opinions in this area of the law reveals some conflict among holdings, even greater conflict among dicta, and in many of the opinions a failure to observe explicitly the distinction between the definition of the standard that the factfinder is to apply and the statement of rules about methods of proof, including permissible inferences that a factfinder may draw from circumstantial evidence in deciding whether a state-of-mind standard is satisfied in the particular case. Though many dicta and some holdings support defendant's contention for an objective standard, I conclude that the weight of authority is against this contention. In these circumstances, it seems unlikely that Massachusetts courts will be persuaded to adopt the view urged by defendant.

I conclude that it is most likely that the resolution of this issue in Massachusetts law will be consistent with the common-sense interpretation of the clauses on Termination of Coverage and Time Limit for Discovering and Reporting Loss and Bringing Suit that is stated in Parts III and IV of this Opinion.

## VI.

Throughout the legal system, in relation to any standard of judgment concerning a

state-of-mind of knowledge (including standards phrased in terms of discovery or awareness), courts must address a problem of meaning commonly phrased as the issue of "reckless disregard."

In the law of deceit, the historical development of the issue is easily traced back at least as far as *Derry v. Peek*, 14 App.Cas. 337 (House of Lords, 1889). In that opinion one finds precisely the same kind of conflicting implications as appear in *Gilmour* —the same shift of focus among different passages in the opinion (without explicit recognition of the shift) between definition of the standard of knowledge (of falsity of a representation) and recognition that an inference of knowledge may be based on circumstantial evidence. Despite the ambiguity of the opinion in this respect, however, *Derry v. Peek* is more often interpreted as supporting a state-of-mind standard of knowledge than an objective standard imposing liability for careless failure to know one's representation of fact was false. *See, e.g., Reno v. Bull*, 226 N.Y. 546, 124 N.E. 144 (1919) (holding that trial court erred in charging the jury that if defendants could have discovered falsity of representations by exercise of ordinary care "they are just as liable as if they had actual personal knowledge that they were false," and citing *Derry v. Peek* in support of this holding).

Another theme in *Derry v. Peek* as it is usually interpreted—a theme entirely consistent with requiring a state-of-mind standard rather than an objective standard—is that the standard is satisfied not only by a finding of knowledge of falsity but also by a finding of conscious knowledge of lack of knowledge as to whether the representation is true or false. The opinion in *Derry v. Peek* refers to making a false representation "without belief in its truth, or ... recklessly, careless whether it be true or false." This state of mind is commonly referred to as "reckless disregard" for the truth or falsity of the statement. This theme appears in the modern law of fraud in Massachusetts. *See Computer Systems Engineering v. Qantel, Corp.*, 571 F.Supp.

1365, 1375–77 (D.Mass.1983), *aff'd*, 740 F.2d 59 (1st Cir.1984).

This same theme of recognizing a state of mind of "reckless disregard" appears, in the law of defamation, as part of federal constitutional standards. *E.g. Gertz v. Robert Welch Co.*, 418 U.S. at 332, 94 S.Ct. at 3003; *St. Amant v. Thompson*, 390 U.S. at 731, 88 S.Ct. at 1325. Thus, it is established that, " 'knowledge' or 'reckless disregard' is a subjective matter, a question of state of mind, quite distinct from any question of objective reasonableness or prudence." *National Association of Government Employees, Inc.*, 379 Mass. at 231, 396 N.E.2d at 1003 (citing *St. Amant* ).

In criminal law a similar theme of "reckless disregard" often appears in the definition of "wilful" as an element of the definition of a criminal offense. *See, e.g., United States v. Cincotta*, 689 F.2d 238, 243 (1st Cir.) (approving jury instruction on "conscious avoidance of knowledge"), *cert. denied*, 459 U.S. 991, 103 S.Ct. 347, 74 L.Ed.2d 387 (1982); *United States v. Lamont*, 565 F.2d 212 (2d Cir.1977), *cert. denied*, 435 U.S. 914, 98 S.Ct. 1467, 55 L.Ed.2d 505 (1978); E. Devitt & C. Blackmar, *Federal Jury Practice Instructions* § 1409 (1977 & 1985 Supp.) ("guilty knowledge"). Thus, "specific intent" of the defendant may be proved if the jury makes a "finding beyond reasonable doubt of a conscious purpose to avoid enlightenment.... A showing of negligence or mistake is not sufficient to support a finding of wilfulness or knowledge." *Id.* § 1409, at 390.

It seems likely indeed that, having applied this theme (*i.e.* the theme that a state-of-mind standard concerned with knowledge extends to one's knowing that one does not know the truth or falsity of a matter) in the quite different contexts of the law of fraud and the law of defamation, Massachusetts courts will apply it as well in the context of insurance law, when the issue is squarely presented for decision.

It does not follow that the precise formulation of the state-of-mind standard commonly referred to as "reckless disregard" will be the same in all contexts. Indeed, it

is clear, for example, that the standard stated by the Supreme Court in *St. Amant,* in relation to the constitutional privilege for media defendants in libel cases, is more difficult to prove than the standard developed in Massachusetts decisions in relation to the common law of deceit. One—the *St. Amant* standard—is aptly described as a "high degree of awareness of . . . probable falsity" of the allegedly libelous statement, 390 U.S. at 731, 88 S.Ct. at 1325 (citation omitted). The other is more aptly described as conscious disregard of a recognized uncertainty about the truth of falsity of the statement.

I conclude that, in the present context, the Massachusetts court will adopt a standard at least as expansive as conscious disregard of recognized uncertainty about whether a known act is or is not fraudulent. A compelling factor leading to this conclusion is that the termination clause and the notice clause are plainly aimed at providing incentives for early detection of fraud in order to prevent further losses from occurring after suspicions of fraud have arisen. To read these clauses as permitting the insured to disregard early suspicions would be contrary to this plainly implicit, if not explicit, objective of these contract clauses.

I conclude that the state-of-mind standards of "discovery" and "awareness" as those terms are used in paragraphs 5 and 6 of the bond at issue in this case are satisfied if it is found as a fact that a person in authority for Boston Mutual had the state of mind of awareness of uncertainty about whether a known act of Thompson (late delivery of premiums) might be fraudulent and, having that state of mind, proceeded in dealing with him, and with Fireman's Fund, with the further state of mind of conscious disregard for ascertaining whether Thompson's act was fraudulent or not.

## VII.

Turning to the evidence in this case, I accept as background facts, without reciting them here, the facts stated in the parties' stipulation, filed as Joint Exhibit 1. I take note that it is undisputed that Boston Mutual's executives believed, in the spring of 1978, that Thompson had engaged in fraudulent acts before that date, causing premiums received by Thompson not to be paid over to Boston Mutual as due. That loss (to which I refer herein as the 1978 loss) is not in issue here, however, since it occurred and was exposed before commencement of coverage under which the present action is brought.

Turning, as factfinder, to evaluation of conflicting evidence before me, I note that when Boston Mutual's General Counsel conducted an investigation in the spring of 1981, one executive, now deceased, reported to him (referring to the 1978 loss) that in the spring of 1978, he became aware that Thompson had "stolen" some of Boston Mutual's funds that came into Thompson's hands as premiums on group coverage. In the memorandum that the Controller, Goggin, wrote to the President, Finnegan, on March 29, 1981, Goggin wrote, referring to the 1978 loss, Thompson "had stolen our money." *Defendant's Exhibit 219* at 1. At trial, Goggin appeared to take the position that he arrived at this interpretation only after learning in March 1981 of Thompson's "secret" bank account that was established after 1978. Goggin preferred at trial to speak of the 1978 loss as having resulted from "misuse" of Boston Mutual's funds. It is undisputed that Thompson acknowledged this "misuse," as Goggin prefers to characterize it, and signed a promissory note for $120,000 as part of the arrangements for his continuing to serve as a Boston Mutual "third-party administrator" of group policies that generated premiums of more than $500,000 annually.

Also, it is undisputed that, in March 1981, Boston Mutual executives discovered conclusive evidence that Thompson had been diverting premiums to his own use to a massive extent, resulting in loss to Boston Mutual in an amount estimated in the summer of 1981 at more than $500,000, and later calculated, according to evidence of-

fered by Boston Mutual at trial, at a gross of $546,844.52 and net loss of $327,278.84.

With respect to when any Boston Mutual executive first realized that Thompson was engaged in fraudulent acts after the delivery of the $120,000 promissory note in 1978, each Boston Mutual employee (or former employee) who appeared as a witness in this trial denied having any suspicion whatsoever, before March of 1981, that Thompson was dishonest rather than merely an extraordinarily charming sales representative and extraordinarily inefficient administrator. As factfinder, however, I cannot credit this testimony. The circumstantial evidence against it is overwhelming.

Boston Mutual executives, including Goggin, became aware in July 1979 that the payroll centers (where employee contributions to premiums were deducted from payroll, to be remitted to Thompson) were being reported by Thompson as substantially late in remitting premiums to Thompson. *See Plaintiff's Exhibit 114; Defendant's Exhibits 209 & 233.* Acting on this knowledge, Boston Mutual gave closer attention to the growing lag time between the date of deduction from payroll at the payroll centers and the date of receipt of the premium payment by Boston Mutual.

I find that at a meeting of Boston Mutual executives on December 10, 1979, all of the seven executives who participated in that meeting (Goggin, Conroy, Lamb, Ryan, Tierney, Vivona, and Cahill) were made aware, through discussion with each other during the meeting, of the following facts: (1) only $15,000 of the principal on the 1978 note of $120,000 had been paid; (2) Boston Mutual's plan that payroll centers would remit premiums to Thompson by checks, which Thompson would deposit directly in a special bank account from which no payout could be made without Boston Mutual authorization, was not working to reduce the lag time between payroll deduction and receipt of premium by Boston Mutual; and (3) the lag time, which had been only a few weeks, through April 1979, had begun to increase noticeably commencing in May 1979, and by December 1979 had

reached as much as four months or more (at a rate of more than $40,000 per month), and that the lag was occurring in relation to all or nearly all of the payroll centers, twelve in number, operating under independent management. I cannot credit the assertion, even though under oath, that neither the President, to whom the Controller was reporting, nor any other among the executives who attended the meeting of December 10, 1979, suspected that the explanation was that Thompson was diverting funds after the checks reached him rather than, as Thompson was telling them, the payroll centers were all late in remitting. Moreover, the inference I draw is supported by a document in evidence, *Defendant's Exhibit 244,* which I find is in the handwriting of Beverly Lamb and is a set of notes prepared by her during the meeting of December 10, 1979. An item numbered 3 reads: "Checks currently made payable to A.M. Thompson." Beside this item, in parentheses, is the following: "So he could either deposit some and cash some." From the item numbered 3 an arrow points to an entry below as follows: "We should require checks be made payable to Boston/Mutual and sent to lock box." Goggin acknowledges that the plan for setting up a lock box to which payroll centers would remit, rather than remitting to Thompson Insurance Service, was his suggestion. Given the context in which this suggestion was developed, I cannot credit testimony that no suspicion of fraud on the part of Thompson entered his mind and that, instead, the lock-box arrangement was aimed at correcting administrative inefficiency or merely gathering more information about the source of the lag.

Applying the standards developed in Parts III, IV, and VI of this Opinion, I find that Goggin and all others who participated in the meeting of December 10, 1979, at least when leaving that meeting if not when entering it, had formed the state of mind of being "aware" of the act of Thompson of remitting his premiums to Boston Mutual with increasing lag time from the date of payroll deduction, being

aware of uncertainty about whether this known conduct was fraudulent, and proceeding with plans for future administration of the Thompson agency group policies with conscious disregard for promptly taking steps to ascertain whether Thompson's act was fraudulent or not. I find also that even apart from the "conscious disregard" standard, and on a more rigorous standard of awareness apart from its extension to conscious disregard, Goggin, as Controller and the person to whom greatest authority in this matter was assigned by the president, had formed the state of mind of being "aware" of Thompson's act of remitting his premiums to Boston Mutual with increasing lag time from the date of payroll deduction and being aware that Thompson's act could be made the basis of a claim of fraud by Thompson, as the meaning of the quoted phrases has been construed in Parts III and IV of this Opinion.

More difficult to prove, perhaps, is the contention that participants in the meeting of December 10, 1979, by the time of leaving that meeting if not before, had formed the state of mind of "discovery ... of any act or circumstance indicating a probable claim" of fraud by Thompson, as the meaning of that phrase has been developed in Parts IV–VI of this Opinion. On the evidence before me, however, I find this contention proved. The evidence, including *Defendant's Exhibit 244*, is compelling that the discussion in this meeting adverted explicitly to the possibility that Thompson was cashing premium checks received from payroll centers rather than depositing them promptly in the controlled account, that Thompson knew this to be a forbidden practice, and that he had falsely represented to Boston Mutual that the explanation of the lag time was delay of the payroll centers in sending checks to him.

The evidence is even more compelling that Goggin and Finnegan, to whom I find he reported candidly and contemporaneously, had, after another year had passed, before the end of December 1980, formed the state of mind of "discovery ... of any act or circumstance indicating a probable claim" of fraud by Thompson. They were aware that the lock-box arrangement was not working to keep all payroll center remittance checks out of Thompson's hands, that the lag time between payroll deduction and Boston Mutual's receipt of premium continued to increase during 1980, that Thompson had failed to mail out internal audit letters to the payroll centers as promised and as later represented, and that when "second request" letters were mailed out by Boston Mutual, they produced two prompt responses with documentary proof that the payroll centers had been remitting on time.

## VIII.

Before concluding that coverage was terminated under paragraph 5 no later than December 10, 1979 (and, of course, even more surely by December 31, 1980) and that written notice was required under paragraph 6 within fifteen days after December 10, 1979 (and, more surely, within fifteen days after December 31, 1980), I must address the question, reserved in Parts III and IV, as to whether "claim under this bond" in paragraph 5 and "claim hereunder" in paragraph 6 require a finding of fact that a person in authority for Boston Mutual formed the state of mind of recognizing (that is, adverting to) the existence of the bond and the relationship among the acts of Thompson, the possibility of their fraudulent character, and the coverage under the bond.

No direct evidence was offered with respect to whether most of the participants in the meeting of December 10, 1979, knew about the bond and the scope of its coverage. The evidence does show, however, and I find, that at least one of the participants, Goggin, was fully aware of the bond. He had participated in discussions with the broker about the blanket policy previously in force and its inadequacy from Boston Mutual's perspective because of a $10,000 per employee limit and because Fireman's Fund took the position it did not cover the acts of "third-party administrators" such as Thompson. Goggin negotiat-

ed on behalf of Boston Mutual for issuance of the bond under which the present claim is asserted.

On two independent grounds, I conclude that Goggin's knowledge of the bond satisfies this element of the state-of-mind standards defined in paragraphs 5 and 6 of the bond.

First, taking into account the background of Goggin's active participation in the claim, later abandoned, under the blanket policy because of Thompson's earlier "misuse" of funds before April 1978, and Goggin's active participation in the negotiations for issuance of the bond under which this claim is brought, I find that Goggin did during and after the meeting of December 10, 1979, have the state of mind of awareness of the bond and of the probability of a basis for a claim under it.

Second, I conclude that the circumstances of this case invoke Massachusetts precedent concerned with the application of a state-of-mind standard to an institutional entity. Is the legal entity accountable when one authorized representative knows one set of facts (in this case, the act of Thompson and its possibly fraudulent character) and another authorized representative knows another fact essential to satisfying the full definition of the state-of-mind standard (in this case, arguably at least, the existence of the bond and the association between the possibly fraudulent act and the coverage under the bond), but no authorized representative knows both? I conclude that *Guthrie v. J.J. Newberry Co.*, 297 Mass. at 245, 8 N.E.2d at 774, authoritatively answers this question at least for a context such as is presented here. In *Guthrie* the corporation's restaurant manager had knowledge of the plaintiff's contention that she had been made ill by eating food purchased in the corporation's restaurant. The report of the case does not refer to any evidence that the restaurant manager reported this knowledge to the corporation's executives, who later received a notice of claim from plaintiff's attorney, the adequacy of which was challenged because of its failure to be more specific about the claim (by stating, for example, the contention that had been made known to the restaurant manager earlier). On the rationale of "imputing" knowledge of each of its representatives to the corporation, the court held the notice adequate. *Id.* at 249, 8 N.E.2d at 776.

One may be troubled about how far this principle should be extended, especially when the state-of-mind standard is central to the basis of liability rather than applying only to a subsidiary issue such as the adequacy of notice of claim. But I conclude that the analogy to *Guthrie* is close and compelling for several reasons. First, the issue here, as in *Guthrie*, relates to a requirement of notice. Second, the obvious purpose of the requirement of written notice to the insurer under a fidelity bond is for the benefit of the insurer, and for reasons quite consistent with public interest in avoiding an incentive structure in which the existence of fidelity insurance might become an inducement to an employer to take risks of potential fraud of employees that an employer who had no fidelity coverage would not take. In short, the requirement of written notice when the possibility of a claim is first discovered, rather than allowing notice to be deferred until proof of fraud is in hand, is entirely compatible with public interest. *Cf. Gilmour*, 292 Mass. at 211, 197 N.E. at 676 ("the language [of the policy] cannot reasonably be construed to mean that the giving of notice could be deferred until such time as the plaintiffs had not only discovered but were actually able to prove that loss had occurred"). I conclude that Massachusetts law would not permit a legal entity (either a natural person employing many employees or a legal entity such as Boston Mutual, which can act only through employees), to insulate itself against application of a state-of-mind standard to its disadvantage by withholding from most of its employees, including those in such executive positions as were held by the participants (other than Goggin) in the meeting of December 10, 1979, information about its fidelity bond coverage.

## IX.

In reaching the findings and conclusions stated in this Opinion, I do not deprecate the difficulty and sensitivity of the problems facing Boston Mutual's representatives as they sought to deal with mismanagement of funds by an agent who was responsible for administering group policies negotiated with unions representing employees in public agencies and generating premiums of more than $500,000 annually. A charge of fraud is a sensitive and serious matter in any circumstances, and an early charge based on limited evidence raises even more severe problems. It may be that circumstances would support a business judgment to take the chance of losing a valid claim under a fidelity bond rather than risking adverse consequences of an early charge of fraud that would be likely to lead to loss of this annual flow of premiums, and perhaps even greater loss indirectly, whether or not the charge of fraud could be proved. When Boston Mutual executives first discovered evidence of Thompson's renewed practice of delaying remittance of premiums, the amount involved may have appeared to be moderate, and it may have appeared likely that, as defense counsel has suggested in argument, deft efforts to get Thompson out of the premium flow would succeed in both averting future losses and recouping past debts.

But the issue before the court when an allegedly late notice of claim is made upon a fidelity bond does not concern justification for a business judgment. Rather, the legal issue the court must face squarely is whether the standard triggering the notice requirement is a state-of-mind standard and, if so, whether, under the evidence before the court, the court finds that state of mind to have existed more than the contractually stated number of days (herein fifteen) before notice was given. Harsh as it may be to make such a finding in the face of sworn testimony of persons whose state of mind is at issue that they did not have that state of mind, when a fair reading of the contract is that only a finding of a state of mind, and not violation of an objective standard, will trigger the notice requirement, candor requires that a court address the state-of-mind issue squarely and rest its decision on that ground. Any different response by the court could only lead to more ambiguity and uncertainty about the state of precedents in this area of the law than already exists.

## X.

On the basis of the findings and conclusions stated in Parts I through VIII, I conclude that under paragraph 5 of the bond coverage for fraudulent acts of Thompson terminated on December 10, 1979, if not earlier, and that under paragraph 6 Boston Mutual was obligated to give written notice to Fireman's Fund within fifteen days after the "discovery" of December 10, 1979. Because I conclude also, for reasons stated below, that failure to give the written notice defeats the entire claim of Boston Mutual, I need not determine whether some person in authority for Boston Mutual became "aware" of Thompson's fraudulent acts at an earlier date, before occurrence of some of the losses that had accrued by December 10, 1979.

By the terms of paragraph 6 of the bond, written notice is a "condition precedent to recovery hereunder." Boston Mutual has not challenged the defense contention that this provision is enforceable, and indeed it could not successfully do so. The opinion in *Gilmour* assumed that a similar provision would have been enforceable as a condition precedent to liability had the trial court made findings to support it. Recent developments regarding the use of the notice defense do not affect the result in this case. Legislation enacted in 1977 requires an insurer to prove prejudice from late notice in order to rely upon noncompliance with a notice requirement as a defense. Mass.Gen.Laws Ann. ch. 175, § 112 (1984). By its own terms, the statute applies only to a "motor vehicle liability policy, ... or under any other policy insuring against liability for loss or damage on account of bodily injury or death, or for loss or damage resulting therefrom, or on account of

damage to property." *Id.* In 1980 the Supreme Judicial Court of Massachusetts applied a similar prejudice requirement to all liability insurance policies not covered by the legislation. *See Johnson Controls, Inc. v. Bowes,* 381 Mass. 278, 282, 409 N.E.2d 185, 188 (1980). The parties, however, have not argued that this decision is applicable in this case because the court applied the ruling only to claims arising after August 5, 1980. Thus, I do not and need not decide whether this decision would apply by analogy to fidelity insurance policies. In any event, Fireman's Fund has demonstrated that prejudice has resulted from Boston Mutual's failure to give timely notice.

### XI.

In its complaint Boston Mutual also asserted a claim for treble damages against Fireman's Fund for a wilful violation of the unfair and deceptive practices provision of the state consumer protection statute. *See* Mass.Gen.Laws ch. 93A, § 2 (1985). This claim was primarily based upon its alleged ability to demonstrate that Fireman's Fund had wrongfully denied coverage under the fidelity bond. Having decided that Boston Mutual did not give adequate notice to the insurer, I conclude that the state consumer protection claim must fail under the circumstances of this case. Although Boston Mutual has not abandoned this independent claim, no authorities have been provided that would support a claim on these facts. Plaintiff argues that defendant's explicit reservation of defenses other than late notice, as well as relying on late notice, was an unfair and deceptive act or practice. I cannot so find. Instead, I find that defendant acted reasonably and in good faith in reserving its rights to contest liability. In these circumstances I do not address the question whether such a claim would ever be viable without success on a primary assertion of liability under the policy.

On the foregoing findings and conclusions, the clerk is directed to enter judgment for defendant.